**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

September 28, 2017

Joel E. Friedlander, Esquire
Jeffrey M. Gorris, Esquire
Christopher P. Quinn, Esquire
Friedlander & Gorris, P.A.
1201 North Market St., Suite 2200
Wilmington, DE 19801

Rudolf Koch, Esquire
Rachel E. Horn, Esquire
Matthew D. Perri, Esquire
Ryan P. Durkin, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

John L. Reed, Esquire
Ethan H. Townsend, Esquire
DLA Piper LLP (US)
1201 North Market St., Suite 2100
Wilmington, DE 19801

Re: *Elizabeth Morrison v. Ray Berry, et al.*
Civil Action No. 12808-VCG

Dear Counsel:

The Plaintiff[1] was a stockholder[2] in The Fresh Market (the "Market" or the

---

[1] All well-pled facts drawn from Plaintiff's Verified Complaint ("Compl."), together with the reasonable inferences therefrom, are presumed true for purposes of evaluating Defendants' motion to dismiss. *Cent. Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011). However, I am not required to "draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011). Consideration of certain documents filed with the SEC are also appropriate in this case as they are "both integral to and incorporated into the Plaintiff's complaint." *New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *2 n.1 (Del. Ch. Sept. 30, 2011). I note that the Plaintiff alleges that certain portions of the Schedule 14D-9 are "false and misleading." Compl. ¶ 118.

[2] Aff. & Verification of Elizabeth Morrison Pursuant to Ct. of Ch. R. 23(AA) and 3(AA) ¶ 2.

"Company"), a Delaware corporation owning a grocery store chain.[3] The Market was acquired by an entity controlled by a private equity firm, Apollo Management, L.P. ("Apollo").[4] The founder of the Market, Ray Berry, rolled his equity ownership in the Market into the acquirer as a part of the deal.[5] At the time of the merger, Ray Berry was a director of the Market.[6] Together with his son,[7] he owned a significant block of Company stock, nearly ten percent of the outstanding common stock.[8] Nearly eighty percent of the outstanding shares tendered into the merger.[9] The Plaintiff alleges a breach of fiduciary duty[10] by the director defendants[11] and that Brett Berry aided and abetted that breach of fiduciary duty.[12]

For reasons explained fully in a number of opinions of this Court and our Supreme Court, this jurisdiction has determined that there is little utility in a judicial review of a corporate merger in which an uncoerced and fully informed vote of the common stockholders has ratified a decision of the directors that the merger is in the

---

[3] Compl. ¶ 3.
[4] Compl. ¶ 101; Transmittal Aff. of Christopher P. Quinn Ex. C.
[5] Compl. ¶ 3.
[6] *Id*. ¶ 3.
[7] Defendant Brett Berry is a former CEO and a former Vice Chairman of the Company Board. Compl. ¶¶ 1, 3.
[8] *Id*. ¶¶ 3, 44.
[9] Aff. of Rachel E. Horn in Support of the Dir. Defs.' Mot. to Dismiss ("Horn Aff."), Ex. N ("Horn. Aff. Form 8-K").
[10] Compl. ¶¶ 134–40.
[11] The director defendants include Richard A. Anicetti, Michael D. Casey, Jeffrey Naylor, Richard Noll, Bob Sasser, Robert K. Shearer, Michael Tucci, Steven Tanger, and Jane Thompson. *Id*. ¶¶ 24–33. Richard A. Anicetti was also the CEO at the relevant time. Compl. ¶ 24.
[12] *Id*. ¶¶ 142–46.

stockholders' best interest.[13] This matter, to my mind, presents an exemplary case of the utility of that ratification doctrine, as set forth in *Corwin* and *Volcano*. Here there was no coercion applied to the stockholder vote.[14] An insider and board member, Berry,[15] was in favor of a private equity takeover and, without initially informing the other directors, spoke with potential equity investors.[16] He favored Apollo.[17] Apollo, armed with the founder's preliminary agreement to roll over his equity, made an unsolicited offer for the Market.[18] This offer put the Market in play.[19] Berry recused himself from consideration of a potential sale by the Board of Directors,[20] and waived notice of any meetings at which strategic alternatives would be discussed.[21] The remainder of the Board consisted of eight independent directors.[22] These directors created a special committee of three independent

---

[13] *See, e.g., Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 306 (Del. 2015) ("For sound policy reasons, Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines that a transaction with a party other than a controlling stockholder is in their best interests."); *In re Volcano Corp. Stockholder Litig.*, 143 A.3d 727, 747 (Del. Ch. 2016) ("[A]cceptance of a first-step tender offer by fully informed, disinterested, uncoerced stockholders representing a majority of a corporation's outstanding shares in a two-step merger . . . has the same cleansing effect under *Corwin* as a vote in favor of a merger by a fully informed, disinterested, uncoerced stockholder majority.").

[14] Compl. ¶¶ 10, 122.

[15] Unless otherwise indicated, "Berry" refers to Ray Berry and not his son, Brett Berry.

[16] Compl. ¶¶ 40–41.

[17] *Id.* ¶ 5.

[18] *Id.* ¶ 6.

[19] *Id.* ¶¶ 7, 11.

[20] *Id.* ¶ 79.

[21] Horn Aff. Ex. A at 18–19 ("Horn Aff. Sched. 14D-9.").

[22] Compl. ¶¶ 24–32; Horn. Aff Ex. C at 7.

directors to consider strategic alternatives;[23] ultimately, the Company engaged in a three-month auction[24] by hiring J.P. Morgan Securities LLC ("J.P. Morgan"),[25] soliciting thirty-two potential bidders,[26] receiving five indications of interest,[27] and evaluating several offers.[28]  At the end of this five-month process, Apollo was the successful bidder, and the Board, on recommendation of the special committee, approved the tender offer described above.[29]  Because the majority of the shares were tendered,[30] (and because there are no allegations of waste) the only remaining question is whether the vote was adequately informed so as to serve as a ratification of the Board's decision.  I conclude that it was and that therefore this matter must be dismissed.

The Plaintiff makes two broad arguments that the tender was uninformed.  The first, and easiest to deal with, involves the financial disclosures.[31]  The Board hired J.P. Morgan to provide a fairness opinion on the Apollo offer.[32]  J.P. Morgan used

---

[23] Compl. ¶ 53; Horn Aff. Sched. 14D-9 at 18.

[24] Compl. ¶¶ 53, 84.

[25] *Id*. ¶ 53.

[26] Horn Aff. Sched. 14D-9 at 22.

[27] *Id*.

[28] *See* Compl. ¶¶ 84; Horn Aff. Sched. 14D-9 at 23.

[29] Compl. ¶ 101; Horn. Aff. Form 8-K; Pl. Elizabeth Morrison's Answering Br. on Cross-Motions for Consolidation & Appointment of Lead Pl. & Lead Counsel Ex. D at 2 ("Pl.'s Ans. Br. Ex. D Sched. 14D-9 Amend. No. 5").

[30] Compl. ¶ 101; Horn. Aff. Form 8-K.

[31] Compl. 126–27.

[32] *Id*. ¶ 53.

management projections,[33] engaged in a DCF analysis,[34] and determined that the purchase price was within the range of fairness, although marginally so.[35] The Plaintiff's specific complaints of disclosure insufficiency are that the disclosures provided the stockholders with insufficient information about the "conservative" nature of management's November 17, 2015 projections[36] and failed to disclose that sensitivities run on those projections by J.P. Morgan "included upside as well as downside sensitivities."[37] However, nothing indicates that the management projections[38] or J.P. Morgan's analysis[39] are anything other than their best estimates, which were adequately described.[40]

The Plaintiff relies more heavily on what she considers to be disclosure violations concerning Berry's role in the process.[41] The disclosures describe the

---

[33] *Id.* ¶ 73.

[34] *Id.* ¶¶ 73, 97, 99.

[35] *Id.* ¶¶ 20, 73, 107; Horn Aff. Sched. 14D-9 at 43.

[36] Compl. ¶ 63, 126 (alleging that management's "15% overall risk adjustment to the projections . . . reflect[ed] the[ir] incentive[s]" from a "compensation package" rather than "different initiatives receiving different risk weighting based on likelihood of achievability.").

[37] *Id.* ¶ 127 (stating that "revenue growth and EBITDA margin sensitivities reviewed at that [December 1, 2015] Board meeting ranged from -3% to +1%").

[38] Horn Aff. Sched. 14D-9 at 46–48 (including a "summary of the unaudited prospective financial information for the years 2016 through 2025 prepared by TFM's management . . . based on the information available to TFM's management at the time the November 17 Management Case was developed.").

[39] Pl.'s Ans. Br. Ex. D Sched. 14D-9 Amend. No. 5 at 4 (noting that the December 2015 Board meeting discussed the receipt of "certain sensitivity information regarding different assumptions as to revenue and gross margin in the event that TFM was not able to execute on its strategic plan or the timing of certain initiatives contained in the strategic plan was later than anticipated" and included financial projections for three additional scenarios); Horn Aff. Sched. 14D-9 at 46–48.

[40] Horn Aff. Sched. 14D-9 at 46–48.

[41] *Id.* ¶¶ 119–21, 123–25, 128.

elaborate process through which the Board and its special committee and advisors engaged in a wide-ranging auction process and go-shop period.[42]  According to the Plaintiff, however, this very description is misleading because, in her view, the apparent robustness of the auction was a sham.[43]  Berry had already made up his mind that he wished Apollo to be the acquirer and only Apollo had a shot at winning the auction.[44]  If that allegation were sufficiently supported by the pleadings, surely the disclosures were flawed and inadequate to allow the vote to serve as a ratification of the Defendants' actions.

The problem with the Plaintiff's argument is that the *facts* regarding Berry's involvement with Apollo were disclosed.  The conclusion that the Plaintiff reaches—that the auction was a sham—is not supported by the record.  The Plaintiff argues that Berry's commitment to Apollo was far stronger than was disclosed to the Board, the participants in the auction, or the stockholders.[45]  The firmness of his commitment had a chilling effect on the other participants in the auction, according

---

[42] Horn Aff. Sched. 14D-9 at 16–17 (engaging in a strategic review); *Id.* at 17 (retaining counsel and reviewing fiduciary duties); *Id.* at 18 (forming a strategic transaction committee of independent directors); *Id.* (retaining J.P. Morgan as a financial advisor); *Id.* at 21–22 (soliciting thirty-two parties to submit bids in an auction run by the special committee); *Id.* at 22–23 (receiving and evaluating five indications of interest); *Id.* at 23–24 (evaluating a proposal for exclusivity by Apollo and granting data room access to several parties); *Id.* at 27 (negotiating a "go-shop" arrangement); *Id.* at 31 (requesting an increase in the offer price from Apollo); *Id.* at 33 (convening the Board, except for Ray Berry, to vote on the strategic committee recommendation).

[43] Compl. ¶ 117.

[44] *Id.* ¶¶ 42, 117.

[45] *Id.* ¶¶ 42, 46–49, 117.

to the Plaintiffs, and thus the auction was a mere pretense.[46]  But this is a non sequitur:  If the Board, the participants in the auction, and the stockholders were uninformed of the true commitment between Berry and Apollo, that undisclosed fact cannot have chilled the auction.  In fact, a review of the SEC filings indicates that Berry's involvement with Apollo was disclosed to the stockholders.[47]  What is not described is the gloss on those facts that the Plaintiff supplies.  She complains that the directors did not disclose that they had initially been lied to by Berry about his involvement, a fact that the Plaintiff asserts must have been apparent to the directors under the facts they did disclose.[48]  This is a self-defeating argument.  To the extent disclosed facts must have demonstrated Berry's mendacity to the directors,[49] it

---

[46] *Id.* at 54, 88, 102, 120.

[47] Horn Aff. Sched. 14D-9 at 16 (recusing Ray Berry from Board meetings and deliberations of the Merger), 17–18 (discussing "three separate conversations" prior to October 2015 between Ray Berry and Apollo and Ray Berry's willingness to "consider an equity rollover" and that "he would only participate in a transaction that was supported by the Board"), 18 (discussing a news article stating that Ray Berry was "exploring a bid to take TFM private"), 20 (reaffirming Apollo's proposal in November 2015 for an all-cash transaction "together with Ray Berry and Brett Berry" and that Ray Berry and Apollo had "engaged in one conversation" since October 20, 2015), 21 (confirming "that Mr. [Ray] Berry continued to be willing to discuss an equity rollover with any potentially interested party that the Board selected as a winning bidder," and that "Mr. [Ray] Berry would agree to not engage in any discussion regarding an equity rollover with any potentially interested party, including [Apollo], until authorized to do so by the [Company]" and that Ray Berry "was not working exclusively with any one bidder"), 27 (determining that "rollover discussions should be permitted only after final bids had been received" and when allowed by the Board), 30 (considering a request by J.P. Morgan to allow J.P. Morgan to "discuss[] an equity rollover prior to announcement of a transaction"), 31 (reiterating Apollo's "interest in speaking with members of the Berry family regarding a potential equity rollover" and the strategic committee's approval of such discussions if "chaperoned by J.P. Morgan" and if "no specific price details would be shared . . . .").

[48] Compl. ¶ 124.

[49] *Id.* ¶ 124 ("The omission is material not only in substance but also because it shows that Ray Berry was lying to the Board, the Board was on notice that Ray Berry was lying to them and the

7

should have been equally clear to the stockholders themselves. More importantly, whether Berry initially was forthcoming about his relationship with Apollo, I find that his position as of the time of the auction process and go-shop—that is, at the time material to stockholders—was adequately disclosed.

The Plaintiff argues that the Schedule 14D-9 "conceals the pressure on the Board from activist stockholders to sell the Company" by failing to specifically mention "a letter from Neuberger Berman, one of the Company's significant stockholders, expressing its view that the Board should consider selling the Company."[50] However, the Board disclosed that the Company "could become the subject of shareholder pressure and communications" if it didn't "enhance efficiency,"[51] and in fact already "initiate[d] a comprehensive strategic review" and "hir[ed] outside financial advisers" as recommended by Neuberger Berman.[52] I find that this disclosure was adequate.

The only factual lacuna in the disclosures that comes close to materiality is that Berry threatened to sell his shares on the market if a merger did not close.[53] On reflection, however, it is not clear to me how this would have affected the total mix of information disclosed; certainly, it would not have made investors less likely to

Board did nothing to address it.")
[50] *Id.* ¶ 122; Horn. Aff. Ex. Q ("Neuberger Berman October 8, 2015 Letter").
[51] Horn Aff. Sched. 14D-9 at 18.
[52] Neuberger Berman October 8, 2015 Letter at 2; *see* Compl. ¶¶ 53 (hiring J.P. Morgan), 58 (conducting strategic review).
[53] Compl. ¶ 13.

tender if they knew that a large blockholder—the founder—was considering a sale if the deal was not consummated. In short, Berry's activities and his connection to Apollo were adequately disclosed to stockholders deciding whether to tender their shares. Unsurprisingly, those stockholders nonetheless accepted the merger by overwhelmingly tendering in favor, given the large premium the merger payment represented over the preannouncement trading price of the Market stock.[54]

Because an uncoerced tender of the majority of shares supported the merger here, the Plaintiff's pleading burden on this motion to dismiss, before I address whether she has otherwise stated a claim, is to plead facts from which it is reasonably conceivable that the potentially ratifying tender was materially uninformed.[55] The Plaintiff pursued documents to bolster her pleading under Section 220, and her position in this case was well briefed and well argued; nonetheless, I find this pleading burden unmet. For that reason, the Defendants' motion to dismiss is granted.

---

[54] The Plaintiff makes an argument in briefing that was not advanced at oral argument, that Berry engaged in a long-term scheme in which he: 1) somehow caused the board, with its majority of independent directors, to discharge the CEO, thereby accelerating a long-term decline in the Market's stock price, reducing the value of Berry's block; then 2) several months later approached private equity firms as part of a takeover scheme favorable to him because of the depressed market price; after which he 3) then recused himself and watched the Board engage in a five-month sales process, involving both equity and strategic investors, confident that the acquirer which would further his interests, Apollo, would prevail. If true, Berry is the most ice-cold killer gambler of whom I am aware. Even on a motion to dismiss, however, I am not required to accept such a scenario, which I do not find to be reasonably conceivable. Pl.'s Omnibus Br. in Opposition to Defendants' Motions to Dismiss at 2, 32, 34.
[55] *In re Volcano Corp. Stockholder Litig.*, 143 A.3d at 747.

To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III